**ICU MEDICAL, INC., Plaintiff,**

v.

**B. BRAUN MEDICAL, INC., Defendant.**

**No. C 01–03202 CRB.**

United States District Court, N.D. California.

Nov. 8, 2004.

---

Christopher B. Hockett, Bingham McCutchen LLP, San Francisco, CA, Mary T. Huser, Adrienne L. Taclas, Mary A. Fuller, Susan Vastano Vaughan, Bingham McCutchen LLP, East Palo Alto, CA, S. Christian Platt, Paul, Hastings, Janofsky &. Walker LLP, San Diego, CA, Michael J. Shuster, McCutchen Doyle Brown & Enersen, LLP, San Francisco, CA, Steven R. Rafalovich, McCutchen Doyle Brown Enersen LLP, East Palo Alto, CA, for Plaintiff.

Tony L. Richardson, Kirkland & Ellis, Los Angelos, CA, Bradford E. Biegon, Daniel F. Attridge, Edward·C. Donovan, Gregory Corbett, James F. Basile, John Thomas Battaglia, Laura R. Bach, Kirkland & Ellis, Washington, DC, for Defendant.

## CLAIM CONSTRUCTION ORDER

BREYER, District Judge.

This suit involves the alleged infringement of United States Patent No. 6,669,-673 (the " '673 Patent"). The '673 Patent discloses a valve to be used in medical environments to connect two fluid-carrying instruments allowing transmission of fluids between them. Now before the Court is the task of construing certain claim terms over which the parties remain in·dispute.

### A. Legal Standard

Patent infringement analysis involves two steps. The first step is to construe the asserted claims, and the second step is to determine whether the accused method or product infringes any of the claims as properly construed. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577

(1996). The first step, construction of the patent claims, is a matter of law and thus the responsibility of the court. *See id.* at 979.

■ "[I]n interpreting an asserted claim, the court should look first to intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). In examining intrinsic evidence, the court should first look to the words of the claims themselves to define the scope of the patented invention. *See id.* Words in a claim "are generally given their ordinary and customary meaning." *Id.*

■ The specification is also examined "to determine if the presumption of ordinary and customary meaning is rebutted." *Brookhill–Wilk 1, LLC v. Intuitive Surgical,* 334 F.3d 1294, 1298 (Fed.Cir.2003) (citations omitted). The presumption of ordinary meaning may be rebutted in two ways. First, the inventor can rebut ordinary meaning where she "has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* at 1299 (citations omitted). Second, the patentee may "act[ ] as his or her own lexicographer [by] clearly set[ting] forth a definition of the term different from its ordinary and customary meaning." *Id.* (citations omitted). With respect to this second method of redefinition, the Federal Circuit has recently established that this may be done "by implication," that is, by "[using] a claim term throughout the entire patent specification, in a manner consistent with only a single meaning." *Irdeto Access, Inc. v. Echostar Satellite Corp.,* 383 F.3d 1295, 1301 (Fed.Cir.2004) (quoting *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1271 (Fed.Cir.2001)). This is accomplished where the patent "repeatedly, consistently, and exclusively" uses the term such as to indicate "the patentee's clear intent to ... limit the term." *Id.* at 1302.

Much of the parties' dispute in the present construction centers around their different views of how this Court should determine whether the terms at issue have an "ordinary and customary" meaning. Braun's argument relies, in part, on their position that many of the terms in the claim do not possess any specialized meaning to those of skill in the art and thus must be defined by the usage of the terms in the specification. ICU's view is that the terms in the claims can be defined according to the generalized, non-technical meanings that would be understood by any layperson. In this regard, ICU's argument is that this Court's claim construction should begin with the definition provided by a general usage dictionary. Braun's argument is that the specification acts as the primary source for defining the terms.

Both parties' positions find at least some basis in law. Braun's position is supported by one line of cases which provides that "where evidence such as expert testimony or technical dictionaries demonstrates that artisans would attach ... no meaning to the claim term independent of the specification 'general-usage dictionaries are rendered irrelevant with respect to that term.'" *Irdeto Access,* 383 F.3d at 1300 (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1321 (Fed.Cir.2004)). ICU's position is bolstered by a second line of cases, which state that "[i]t is well settled that dictionaries provide evidence of a claim term's ordinary meaning" and that where a particular term does not have "an established specialized meaning in technical dictionaries ... of the relevant field of art ... standard dictionaries of the English lan-

guage are the proper source of ordinary meaning of the phrase." *Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 2369 (Fed.Cir.2002) (citations omitted).

This Court acknowledges that there is tension between these cases, and that this tension will almost certainly be resolved by the Federal Circuit in the coming months. *See Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed.Cir.2004) (granting petition for rehearing en banc and directing briefing, *inter alia*, on the relative roles that dictionaries and the specification play in claim construction). However, with respect to the case at bar, this Court finds that the tension does not preclude decision because the parties positions are similar enough that the result would be the same regardless of which line of cases is adopted. Both parties in their briefs have agreed that a general-usage dictionary should play some role in this claim construction. *Cf.* ICU Opening Brief, at 11 (arguing for use of dictionary definition of "flexible element") *with* Braun Brief, at 10 (arguing for use of dictionary definition of "flexible"). The focus of the parties' dispute is therefore narrower than the dispute that *Phillips* will resolve. That is, the parties here merely dispute what weight should be given to the available dictionary definitions when compared to the specification. ICU argues that the dictionary definitions represent "ordinary meaning" and thus there should be a strong presumption that their full breadth is claimed unless something in the specification expressly narrows the scope of the terms. *See Brookhill–Wilk 1*, 334 F.3d at 1298–99 (claims given full scope unless patentee has expressly disavowed scope of coverage). Braun argues that no such presumption should be given, and that instead this Court should evaluate all of the intrinsic evidence-particularly the specification-in order to come to a conclusion with respect to the scope of the terms.

*See Irdeto Access*, 383 F.3d at 1300 ("absent . . . an accepted meaning [in the art, the court] construe[s] a claim term only as broadly as provided for by the patent itself.") (citing *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1570 (Fed.Cir.1997)). This Court, however, does not view *Irdeto Access* as foreclosing any reference to general-usage dictionaries or, for that matter, common sense in construing terms that lack any specialized meaning. To so hold would mean that novel phrases used to describe novel ideas would always have to be defined ad nauseam in a patent specification when resort to simple, commonly understood words in the English language would provide sufficient meaning to satisfy the patent's "notice function." *See Irdeto Access*, 383 F.3d at 1303. *See also RF Delaware, Inc. v. Pacific Keystone Tech., Inc.*, 326 F.3d 1255, 1263 (Fed.Cir.2003) (holding that "when a claim term is expressed in general descriptive words, it typically will not be limited" by the preferred embodiment or by other claims). It would also mean that in cases, such as this one, where the specification does not use disputed terms or uses them only sparingly, such terms would be rendered meaningless, making the process of claim construction impossible. *Irdeto Access* itself refused to go so far, restricting its holding to the particular circumstances in that case in which the applicant had "unequivocally directed the patent examiner, as well as the public, to the specification as the complete source of meaning for the disputed terms." *Id.* Moreover, in that case the court also limited its holding to the fact that the specification had "repeatedly, consistently, and exclusively" used the disputed term in a manner consistent with a narrow interpretation. *Id.*

In short, this Court finds it enough to hold that in the instant case the ordinary

meaning of a term may be determined by reference to a general usage dictionary. However, because this Court finds that none of the disputed terms have specialized meanings in the relevant art,[1] they will not obtain the strong presumption that is provided for in the relevant cases. Instead, this Court will resort to the specification to determine whether the ordinary meaning should be abandoned in favor of a meaning that is more consistent with the use of the term in context. In any event, the overarching rule remains that the claim serves as the primary reference point for the meaning of the terms. *See Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1328 (Fed.Cir.2002) (absent a clear statement regarding scope, the court is constrained to follow the language of the claim rather than the written description).

## B. Flexible Element

ICU argues that the term "flexible element" should be defined as "portion that is capable of being bent or flexed" while Braun argues that it should mean an element that is "capable of being bent without breaking, easily bent" but "not using mechanical or moving parts such as springs or diaphragms." Revised Joint Claim Construction and Prehearing Statement for '673 Patent ("RJCCPS") at 3. Thus, Braun's definition is narrower than ICU's in two respects: 1) "flexible" means flexible without breaking; and 2) "flexible"

means not using mechanical or moving parts.[2]

## 1. Bent Without Breaking

■ The parties agree that the construction of the term "flexible" begins with its dictionary definition. ICU Opening Brief at 11; Braun Brief at 10. The parties further agree that the 1987 edition of the Random House Unabridged Dictionary is the proper general-usage dictionary for this claim construction. ICU Opening Brief at 11; Braun Brief at 10. Random House defines "flexible" as:

1. capable of being bent, usually without breaking; easily bent ... 2. susceptible to modification or adaptation.; adaptable ...; 3. willing or disposed to yield; pliable ... 4. a flexible substance or material, as rubber or leather.

*Random House Unabridged Dictionary* 733 (2d ed.1987). This Court thus may easily dispose of Braun's limitation that a "flexible" object must be able to be bent without breaking. The dictionary definition makes no such categorical statement. Both parties would have been more consistent with their dependence on the dictionary had they argued that "flexible" means "usually without breaking." Accordingly, this Court will construe the term as including structures that are capable of being bent, but usually without breaking.

1. Braun's expert argues that none of the disputed terms have specialized meanings, while ICU's expert states that an individual skilled in the relevant art would recognize the terms to mean what ICU says they mean. ICU's expert, however, cites no specialized dictionaries, treatises or other support of the specialized status of the relevant terms. Moreover, the patent itself is often not internally consistent in its use of the terms: it uses one term (e.g. "flexible element") to refer to an object in the claims and another (e.g."seal") to refer to the same object in the specifica-

tion. For these reasons, the Court finds that the none of the disputed terms have specialized meanings.

2. Braun also contends that this Court's construction of "flexible element" must incorporate the other requirements of the object stated in the claim. However if this Court were to read those other limitations into the definition of the term then the claim would become redundant.

This construction is consistent with the use of the term in the patent. The claim states that the flexible element must be "movable between an uncompressed position ... and a compressed position," while also being able to "flex[ ] to accommodate axial compression." Col. 16:4–12. The specification refers to the "seal"[3] as being "reusable," and "resilient." Col. 2:43–44, 3:35. A construction of the term "flexible" as being easily broken upon compression would conflict with these statements and thus is excluded. However, a construction of the term as being so resilient as to stand up to very strong compression such that it could never be broken would define term in a way not supported by the patent.

## 2. Mechanical Parts, Springs and Diaphragms

Braun is incorrect in asserting that the specification "disavows or distinguishes" the "flexible element" from "prior art valves and connectors that use 'springs or diaphragms'" such that an interpretation of the "flexible element" including mechanical parts is foreclosed. Braun Brief at 14. The specification's description of the advantages of the invention over prior art devices cannot limit the definition of the claim unless it constitutes a clear disavowal. *See Brookhill–Wilk 1*, 334 F.3d at 1301 ("Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention.") (citations omitted); *Astrazeneca AB, Aktiebolaget Hassle, KBI–E, Inc. v. Mutual Pharmaceutical Co., Inc.*, 384 F.3d 1333, 1340 (Fed.Cir. 2004) (criticism of prior art may be a disavowal if implication is clear from discussion of particular feature of the invention). Contrary to Braun's reading of the patent,

it can not be said that the specification "repeatedly, consistently and exclusively" discusses seals as not having mechanical parts. *Irdeto Access*, 383 F.3d at 1303.

The specification describes the prior art mechanical connectors as inferior because they were more prone to malfunction upon repeated use. Col. 1:35–46. The specification does not say that the invention in the '673 Patent will never have mechanical parts. Nor does it say that all inferior designs have mechanical parts. Col. 1:35 (stating that prior art connectors "*often* have mechanical or moving parts" (emphasis added)). Instead, the specification describes the claimed invention as superior to prior art devices because "the *fewer* the mechanical parts the more these connectors can be relied on ...." Col. 1 44–45. Thus the specification merely states that it is preferable for medical valves of the type disclosed in the '673 Patent to have few, although not necessarily zero, mechanical parts. If Braun's interpretation of this portion of the specification as a clear disavowal of all flexible elements using mechanical parts were accepted, then the claimed invention could also never have "moving parts." *See* Col. 1:41–43 ("[t]he more mechanical or *moving parts* such as springs and diaphragms, the more likely that they will function improperly." (emphasis added)). However, the claimed invention undisputedly does have at least one moving part-the flexible element itself. Col. 9:37 (describing the seal in one preferred embodiment as a "movable part[ ]").

Accordingly, this Court construes the term "flexible element" to mean a portion of the valve that is capable of being bent, usually without breaking.

**3.** The parties agreed at oral argument that the term "seal" in the specification is equivalent to the term "flexible element" in the claim.

Thus in construing the term "flexible element," this Court will take into consideration the use of the term "seal" in the specification.

## C. Compressed Position

ICU argues that the term "compressed position" should be interpreted to mean "location in which the flexible element is depressed into less space in the cavity." RJCCPS at 4. Braun contends that the proper definition of the phrase is "the position of the flexible element when it is under axial compression and fully opens the valve." *Id.* The parties' central point of contention on this issue is whether "compressed position" requires full or complete compression, or put differently, whether partial compression is within the scope of the term. The parties also dispute whether the compression referred to is necessarily axial compression, or includes other directions of compression as well.

### 1. Fully Open

Reading "compressed position" in the context of the claim and specification,[4] it becomes clear that the term refers to a configuration of the flexible element in which the valve is in an open state and fluid is allowed to move through it. Col. 16:5–8 (describing "a compressed position in which fluid flow is permitted through said valve"). Thus the parties' disagreement can be described as whether the flexible element can be in a "compressed position" even though the flexible element may still be partially obstructing the fluid from flowing through the valve.

■ Braun's argument focuses on Claim 1's use of the word "between" in its statement that the flexible element is "movable between an uncompressed position . . . and a compressed position . . ." Col. 16:5–8. According to Braun, this requires that there is only one single compressed position in which the flexible element is fully compressed. However, there is nothing inherent in the word "between" that implies that the valve be fully opened. The flexible element could just as easily be understood to move "between" a closed position and a partially open position. Although Braun insists that ICU's understanding is an attempt to rewrite the claim language, it is Braun's interpretation that seeks an impermissible revision. Under Braun's construction the claim would be rewritten from "a compressed position in which fluid is permitted through said valve" to "a *fully* compressed position in which *maximum* fluid flow is permitted through said valve." This Court is not permitted to do so, and thus Braun's proposed limitation is rejected.

### 2. Axial Compression

■ Braun also argues that the compression referred to by the terms "compressed position" and "uncompressed position" may only be axial compression. This time Braun is correct. ICU contends that the claim contains no such limitation and gives as examples statements in the specification indicating that the flexible element exerts radial compression on the inner wall of the valve in both the compressed and uncompressed positions:

> The seal in the decompressed state . . . bears against the wall structure near the opening to seal the opening . . . A fluid tight seal is maintained between the seal section and the wall structure as the seal is moved into the compressed state. The seal section bears against the wall structure . . . .

4. The parties agree that the terms "compressed position" and "uncompressed position" in the claim are equivalent to the terms "compressed state" and "decompressed state," respectively, in the specification. Therefore, the use of the latter terms in the specification is relevant to the construction of the former terms.

Col. 3:38–48. However ICU must rip this excerpt from its context in order to retrieve the desired meaning. Immediately before this portion, the specification states "[t]he third feature is that the resilient seal is adapted to be moved into a compressed state upon insertion of the tip of the medial [sic] implement into the opening and returns to a decompressed state upon removal of the tip." Col. 3:35–38. It is clear from this statement that the source of the compression is the insertion of the medical implement into the opening of the valve. The direction of that compression is axial, that is, it moves along the axis of the valve. *See Random House Unabridged Dictionary* 145 (2d ed.1987) (defining axial as "situated in or on an axis"). The compression referred to in the excerpt cited by ICU is the force applied by flexible element against the inner wall of the valve while it under axial compression from the medical implement. If, on the other hand, ICU is claiming that the statement that the flexible element "bears against the wall structure" in the "decompressed state" demonstrates non-axial compression, then ICU refutes its own argument. As discussed more thoroughly below, it cannot be the case that the flexible element is experiencing any compression from the medical implement in the "uncompressed position."

In using the terms "compressed," "uncompressed" and "decompressed" the patent repeatedly, consistently and exclusively refers to axial compression. For example, the claim discusses the wall of the flexible element as "flexing to accommodate axial compression." Col. 16:11–12. The specification states that "[a] two-way valve eliminating dead space is used which includes a seal which, upon being *compressed by the medical implement,* is pierced to open the valve and reseals upon being decompressed ...." Col. 1:22–26 (emphasis added). ICU has failed to offer any statement in intrinsic evidence that contradicts this meaning. As such, this Court finds that the terms "compressed position" and "uncompressed position" refer only to axial compression.

Accordingly, the term "compressed position" is construed as the position of the flexible element when it is under axial compression from a medical implement[5] and opens the valve.

### D. Uncompressed Position

ICU argues that the term "uncompressed position" refers to the "location in which the flexible element is not depressed into less space in the cavity" while Braun states that it means "the position of the flexible element when it is not under axial compression and closes the valve." RJCCPS at 3. The only difference in the parties' positions is whether or not the flexible element may remain under some axial compression in the "uncompressed position."

At the outset, ICU's attempt to turn "un" into "some" clearly conflicts with ordinary meaning. ICU argues that its construction is supported by a statement in the specification that "[t]he seal has a lip ... [that] upon assembly ... is compressed between the locking elements." In addition, ICU maintains that the flexible element is always under axial compression by atmospheric pressure. While both of these creative arguments do confirm that there is some axial force acting on the flexible element in its uncompressed position, they still mischaracterize the relevant term. Clearly "uncompressed" refers to a

---

**5.** The addition of "from a medical implement" is described under the Court's construction of "uncompressed position."

lack of compression. This begs the question as to what source of compression is referenced. The logical answer-supported by the patent's repeated use of the relevant terms-is that the compression is caused by the insertion of a medical implement into the valve. Col. 1:23–25 (the valve "includes a seal which, upon being compressed by a medical implement"); Col. 3:35–38 ("The third feature is that the resilient seal is adapted to be moved into a compressed state upon insertion of the tip of the medial [sic] implement into the opening and returns to a decompressed state upon removal of the tip . . . ."); Col. 42–45 ("In the compressed state, the seal section is pushed by the delivery end of the medical implement . . . ."); Fig. 5 (depicting compression of the flexible element by a syringe).

■ The term "uncompressed position" is therefore construed as the position of the flexible element when it is not under axial compression from a medical implement and closes the valve.

### E. Ring Shaped Support

ICU argues that the term "ring shaped support" should be construed as "a circular-shaped structure that serves as a foundation, prop, brace or stay." Braun seeks a much narrower construction, limiting the term to "an annular cuff into which the flexible element fits." Braun cites as support for its limitation a portion of the preferred embodiment labeled the "annular cuff 28." Col. 7:29–38. However, in doing so Braun seeks to impermissibly import a limitation contained in the preferred embodiment onto the claim language. *See Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1328 (Fed.Cir.2002) (cautioning against "limiting the claimed invention to preferred embodiments or specific examples in the specification" (citations omitted)). The term "ring shaped

support" uses plain words and the phrase has an ordinary meaning based on the constituent terms' general usage. Braun's attempt to inject ambiguity where there is none is rejected.

■ ICU's interpretation, on the other hand, simply redefines the term "ring shaped support" using dictionary definitions that in no way clarifies the scope of the term. This Court finds little use in doing so and instead agrees with ICU's alternative interpretation that the term is unambiguous and construction is unnecessary. RJCCPS at 4.

### F. Diameter

ICU defines "diameter" as a "straight line passing through the center of an object from side to side." RJCCPS at 4. Braun counters that it means "a straight line passing through the center of a circle and meeting the circumference or surface at each end." *Id.* The disagreement, then, concerns whether a "diameter" can pass through a non-circular object.

■ Once again, both parties begin their definition of the term with the dictionary, which defines "diameter" as:

> 1 . . . a. a straight line passing through the center of a circle or sphere and meeting the circumference or surface at each end. b. a straight line passing from side to side of any figure or body, through its center. 2. The length of such a line. 3. the width of a circular or cylindrical object.

*Random House Unabridged Dictionary* 547 (2d ed.1987). The parties are consequently asking this Court to choose between two equally applicable dictionary definitions. In this context, the Federal Circuit has instructed that,

> [b]ecause words often have multiple dictionary definitions . . . the intrinsic record must always be consulted to identify

which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor .... If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings.

*Texas Digital Sys. v. Telegenix, Inc.,* 308 F.3d 1193, 1203 (Fed.Cir.2002); *Bilstad v. Wakalopulos,* 386 F.3d 1116 (Fed.Cir. 2004). Under this rule, this Court finds that Braun's definition is "most consistent" with the use of the word in the patent.

ICU points to two examples in the specification that it contends demonstrates the correctness of its interpretation. First, ICU points to the statement in the context of the description of an embodiment that "during compression of the seal 36a, the diameter of the ringed wall portions 94 expand outward in the radial direction." Col. 12:13–15. However the "ringed wall" is circular and thus is consistent with Braun's definition. Second, ICU cites a preferred embodiment that "has a bell-shaped skirt and an upper, preferably cylindrical, conduit." Col. 6:65–67. Apparently it is ICU's contention that the excerpts use of the term "preferably" alludes to the possibility of non-circular shapes. The excerpt, however, doesn't even use the term "diameter." Moreover, the shapes it does refer to are circular, in that a cross section of a "bell-shaped skirt" or a "cylindrical" conduit would be a circle.

Each of the specification's uses of the term "diameter" correspond with circular objects. Col. 4:4–5 ("The O-ring elements have increasing diameters, with the smallest diameter element begin [sic] adjacent the proximal end of the cavity."); Col. 7:12–24 (referring to the "outer diameter" of the "upper conduit" in Figs. 4, 5 and 19, which the diagrams depict as circular).

The term "diameter" shall thus be construed as proposed by Braun.

**G. Substantially Flat and Substantially Flush**

The Court finds that the terms "substantially flat" and "substantially flush" are unambiguous and therefore require no construction.

**H. Support Member**

ICU proposes that this term be defined as "a constituent part that serves as a foundation, prop, brace or stay." RJCCPS at 4. Braun defines the term as "a member that supports the valve in a manner that allows it to be removably attached to a fluid dispenser." *Id.* Braun's definition therefore attempts to define the term according to the surrounding claim language, which recites: "The valve of claim 1, wherein said medical valve further comprises a support member enabling said valve to be removably attached to a fluid dispenser." Col. 16:28–31. Braun's definition also adds a further limitation-that the "manner" of support provided by the support member relates to its ability to enable the valve to be removably attached to a fluid dispenser.

 The specification discusses the "support member" in the following context:

> The fifth feature is that the medical valve includes a support member connected to the spike which seals off the distal end of the cavity. The support member may have a Luer–Lock type connector element that enables the valve to be removably attached to, for example, a fluid line connected to a patient. The support member may also be in the form of an adaptor that enables the valve to be removably attached to a fluid dispenser or container.

Col. 4:26–33. This description reveals that there is nothing inherent in "the manner" the support member supports the valve that relates to its ability to be "removably attached to a fluid dispenser." In fact, this excerpt demonstrates that the support member may allow the valve to be removably attached to a fluid dispenser either by having a part that is a "Luer–Lock type connector" or by itself being in the form of an adaptor that provides that ability. Braun's limitation is consequently refuted by the intrinsic evidence.

Accordingly, the term "support member" shall be construed in the manner proposed by ICU.

### I. Removably Attached to a Fluid Dispenser

The Court finds that this phrase is unambiguous and therefore does not require construction.

### J. Single Molding

Claim 5 discloses "[t]he valve of claim 1, wherein said flexible element comprises a single molding." Col. 16:32–33. ICU argues "single molding" means "formed from a single mold" while Braun contends it means "that the flexible element must be formed from a single mold." RJCCPS at 5. The parties both agree that the term "single molding" means "formed from a single mold." The parties also agree that it is the flexible element that is formed from a single mold. ICU Reply Brief at 15. Thus there is no real dispute with respect to the construction of this term. Because Braun's definition is redundant, the Court will give the term the construction offered by ICU.

### K. Rigid Member

The only dispute with respect to the construction of this term is the definition of the word "rigid." *See* RJCCPS at 5.

ICU argues that "rigid" means "stiff," while Braun proposes that it be construed as "stiff or unyielding, not pliant or flexible." *Id.* In the Court's view, neither definition adds clarity to the scope of the term and therefore both are rejected. The term is unambiguous and therefore no construction is necessary.

**IT IS SO ORDERED.**